In re Sloan, Bankrupt.

[Cite as In re Sloan, 15 Ohio Misc. 370.]

(No. B67-312—Decided February 13, 1968.)

United States District Court, Northern District of Ohio, Eastern Division.

*Mr. Marvin A. Sicherman*, for trustee.
*Mr. Albert A. Gilman*, for Universal Finance Company.
*Mr. Philip Kasdan, amicus curiae.*

Preliminary Statements and Facts

Miller, Referee in Bankruptcy.   The Universal Finance Company seized a 1966 Ford two-door sedan automobile from the above named bankrupt subsequent to the commencement of the within bankruptcy proceedings and

pursuant to the terms of the purported security agreement.

The trustee, through his attorney, filed an application for a turnover order against the Universal Finance Company. The application came on for hearing on the 14th day of March, 1967, and by agreement of counsel for the trustee and counsel for the Universal Finance Company certain stipulations and agreements are made as follows:

1. That the value of the automobile would be determined by an appraisal made by Finson & Co., auctioneers, and that the appraisal of Finson & Co., would be binding upon the parties.

2. That the respondent, Universal Finance Company, would be permitted to sell the automobile to minimize losses and depreciation.

3. That the respondent, Universal Finance Company. would turn over to Albert A. Gilman, as counsel for Universal Finance Company, and as escrow agent, the sum determined by the appraisal, which sum was $1900, and which sum pursuant to an order of July 24, 1967, was in fact turned over to Albert A. Gilman by the respondent, and is presently being held by him as such escrow agent.

The trustee bases his claim that the security interest is invalid, by virtue of the provisions of Section 1317.08 Revised Code, wherein it is provided that a willful over charge on a retail installment contract voids the obligation The retail installment sale which is the subject of the case at bar reflects that the cash selling price was $2262.24; that the retail buyer possessed a 1965 car with a trade-in value to the retail seller in the amount of $1600. The retail buyer owed $2143.64 on the said 1965 car; and that there was due and owing on the said car $543.64 over and above the $1600 trade-in value; and that for the purposes of this opinion the term "negative equity" will be used to represent the said minus $543.64. The security agreement reveals that the selling price of the 1966 car to the retail buyer was $2262.24; that the obligation on the 1965 car was paid creating the "negative equity" of $543.64, which "negative equity" was added on to the retail sales price, making the unpaid balance of cash price $2805.88. Insurance premiums

and finance charges were then added in the amount of $753.80, making a total balance due of $3559.68, payable in 36 consecutive monthly installments at $98.88 each.

### The Issue

Can vendor, under a retail installment sale, include in the time balance the refinancing of a "negative equity?"

### Discussion

Section 1317.04, Revised Code, requires the separate items involved in a retail installment contract sale to be listed separately. The pertinent code section requires the retail installment contract recite the following:

"(A) The cash price of specific goods.

"(B) The amount in cash of the retail buyers' down payment, if any, whether made in money or goods or partly in goods.

"(C) The unpaid balance of the cash price payable by the retail buyer to the retail seller which is the difference between divisions (A) and (B)."

The pertinent code section also has additional provisions in it. Keep in mind, under (B) there is a negative down payment of $543.64.

In the retail installment sale which is the subject of the case at bar, the itemization reflected the following:

$2262.24—Cash selling price

543.64—Representing trade-in of 1965 Ford, value $1600.00, owing $2143.64

$2805.88—Unpaid balance

Section 1307.04 (F), Revised Code, requires the seller to set forth on the retail installment contract the amount of the finance charge, and it is further provided that the finance charge and insurance charges may be lumped together as one (1) item. In the case at bar, the seller recited insurance and finance charges totalling $753.80.

The re-financing of the "negative equity" permits the retail seller to increase the unpaid balance of the purchase price with interest, insurance and service charges added thereto in excess of the maximum amount of interest permitted under the Usury Statutes. Section 1317.06, Revised Code, permits a retail installment seller to charge a base

rate of not more than eight percent (8%) per hundred dollars per year and further provides a service charge of $.50 per month (for each month of the contract) on the first $50.-00 unit and $.25 per month on each of the next five (5) $50.-00 units for each month of the duration of the contract. The method by which this charge is computed is multiplying eight percent (8%) times the duration of the contract; in the case at bar, 36 months. This permits the seller to charge the buyer twenty-four percent (24%) of the total unpaid balance and to add a charge of $21.00 per year in addition thereto. It also permits the charge of the twenty-four percent (24%) and $21.00 per year in addition thereto for the entire unpaid balance, without regard to the fact that there is a declining balance each month of the contract by virtue of payments made thereunder.

Without any regard to insurance of any type, the maximum interest charge permitted under the Ohio Retail Installment Sale Act on an unpaid balance of $2805.88, payable over 36 months would be determined as follows:

| | |
|---|---|
| 24% of $2805.88 equals | $673.41 |
| Plus service charge of | 63.00 |
| Total | $736.41 |

In the event the retail installment contract were based upon a $2262.24 cash selling price without the financing of the "negative equity," the maximum charges would be as follows:

| | |
|---|---|
| 24% of $2262.24 equals | $542.94 |
| Finance and Service Charges | 63.00 |
| Total | $605.94 |

Six percent (6%) simple interest on the "negative equity" would not possibly exceed $111.56. Adding the $111.56 simple interest charge to the $605.93 maximum allowable interest on service charges under the true cash selling price totals $717.49, which is a sum less than $736.41, the maximum allowable through the financing of a negative equity.

Section 1317.06 and Section 1317.07, Revised Code, provide that if interest is charged in excess of the amount allowed under the Retail Installment Sales Act, the con-

tract is not enforceable. The pertinent Code sections further provide that the right to avoid the contract, and the obligation to pay, and retain the items pledged as security therefor inure to the successors, assignees, etc. of the retail installment buyer.

The Universal Finance Company, respondent, states in its brief that in this transaction there was no overcharge, and consequently, there has been no proof that the overcharge has been willful as provided by Section 1317.08, Revised Code. The said section states that: *In order for a retail buyer, or any of the aforementioned persons liable on his obligation, to avail himself of this section, he must prove that the retail seller or the holder of the retail installment contract has been notified in writing of the overcharge and has failed within ten days of such notification to advise the retail buyer of a full credit, OR he must prove that*

The security agrement is dated December 13, 1966, which demands the first monthly payment to be made on the 28th day of January 1967.

Dewie Sloan was adjudicated a bankrupt January 17, 1967. The trustee was appointed and qualified February 14, 1967. The car in question was seized by the respondent subsequent to the adjudication of the bankrupt. An application for turnover order of the car was filed on February 28, 1967. Stipulation was entered into as hereinbefore set forth by and between the attorney for the trustee and the attorney for the Universal Finance Company.

The Universal Finance Company had been notified of the overcharge in writing and the contention of the trustee regarding the security agreement on the 23rd day of October, 1967. The Universal Finance Company failed to advise the trustee of a full credit and that there has been no correction of any overcharge within 60 days of October 23, 1967.

### Conclusion

The court finds that a security agreement had been entered into by and between the retail buyer, Dewie Sloan, bankrupt, and the Commerce Ford Sales, Inc., retail seller,

in the purchase of a new car for the price of $2262.24. The retail seller agreed to take in as a trade-in from the bankrupt a 1965 Ford allowing the amount of $1600. The bankrupt had a security agreement on the 1965 Ford in the amount of $2143.64. The retail seller agreed to pay off the $543.64, making this amount the "negative equity." In the security agreement the retail seller listed the selling price of the new 1966 car at $2262.24 and added the "negative equity" minus $543.64 to the selling price, which made an unpaid balance of cash price $2805.88. The retail seller then added insurance premiums and finance charges of $753.80, making a total balance to the retail buyer in the amount of $3559.68, payable in 36 installments at $98.88 each.

The court finds that the interest, insurance premiums and finance charges resulting in the inclusion of the "negative equity" minus ($543.64) violated Chapter 1317, Revised Code.

It is the opinion of this court that there are wrongful charges in violation of Section 1317.08, Revised Code, on the "negative equity" ($543.64). If negative equities were allowed to be added in security agreements, it would open the door for many abuses. In the case at bar, suppose the retail buyer only owed on his obligation on the 1965 Ford $1600, the trade-in value of the car, but informed the retail seller that in order to make the purchase, he must pay off a grocer, a doctor and a druggist, which bills amounted to $543.64. In order to make the sale, the retail seller agreed to pay off the bills and add the total on to the purchase price of the new car, which would include insurance premiums and service charges.

A reading of the assignment executed by the retail installment seller contained on the reverse side of the retail installment contract the following language:

"That the undersigned has no knowledge of any facts which would impair the validity of said instrument or render it less valuable or valueless. That said security agreement and the note secured thereby arose from the sale of the property described in said security agreement."

This statement is not wholly true since the property sold was valued at $2262.24 rather than $2805.88, upon which the insurance, interest and finance charges were computed.

The court further finds that the Universal Finance Company had received the proper notification of the overcharge and that the said retail installment contract and security agreement are not enforceable against the retail buyer or the trustee in bankruptcy.

For the foregoing reasons stated in this conclusion, the court orders Albert A. Gilman, the counsel of the Universal Finance Company as an escrow agent, to turn over to the trustee in bankruptcy the sum of $1900, which sum pursuant to an order of July 24, 1967, was in fact turned over to Albert Gilman by the respondent and is presently being held by him as such escrow agent.

The court directs the trustee, Ronald M. Rubenstein, to prepare a journal entry giving expression to the foregoing decision, reserving therein exceptions to the respondent, Universal Finance Company. Submit the same to the court for approval.

The court further directs that a copy of said journal be submitted to Albert A. Gilman, attorney for respondent.